May it please the Court, Mike Mayer representing the petitioner. There's two major issues in this case. The threshold issue is a jurisdictional issue raised by my friend in the government. And the second issue is on the merits, whether this is a – whether false imprisonment misdemeanor is a crime of moral turpitude. On the threshold issue on jurisdiction, there are unusual facts in this case. But the – the final order of the Board of Immigration appeals – You don't think you guys can go south and south in the corridor? What did you say? You don't think you guys could just go say such good friends? You don't think the two of you could just go south and out in the corridor? Well, we have talked, and we've talked a lot. And it's been in mediation, but it was not resolved, because my friend in the government wants the case in the board. And that has practical considerations for my client, as in the previous case, that my client would be held in mandatory detention for ostensibly two crimes of moral turpitude. He's in Chile right now, right? That's correct. And do I understand correctly, he'd have to come back in order for the board to have jurisdiction? In order for the – in order for the board to have jurisdiction and the immigration judge to – the board or the immigration judge to decide the issue again, he would have to be back in the country. And when he came back, there would be mandatory detention. So he couldn't stay in Chile while this was resolved? No. Okay. So he's got that problem. So he has to come here just to get arrested. Right. And then he's got another problem, right, in that you want to lock in the earlier determinations that these were false imprisonment. You don't want the government looking behind them. Correct. The civil tribunal issue, right. Well, you have that, but don't you also have a Navarro-Lopez issue, possibly? You're saying that there's a missing element? Right. But we took – went on Fonk on a case. I'm aware of that. On Montes. Right. Depending on how that came out, let's say hypothetically if the Court were to say that the – that the missing element doesn't preclude the modified categorical approach, how would that affect you? I don't – Well, I mean, I don't want to get into the subject, you know, but also, too. But, see, you're arguing right now that you just – you can't do the modified because there's a missing element, right? Right. But if Navarro-Lopez is overruled and Aguila-Montes says otherwise, then would you – would the analysis be subject to a modified categorical approach? Well, if Aguila-Montes de Oca was overruled, then on that basis, then it would theoretically be subject to a modified categorical approach. But I don't think there's any conviction record that's reviewable which – So what you're arguing is they don't get a second bite at the apple. I mean – I don't think we'd be affected by that. If they hadn't taken the bite first, then – and if Aguila-Montes goes against you, then it would be – We wouldn't be affected. Then it would be subject to the modified categorical approach. Right. But they're not claiming that there's any documents in the record of conviction that could take – that could show – Exactly. That could make it fit the – even under the modified. Exactly. And – We'll ask them if they are. Okay. Okay. But your point is that you're saying, okay, even if Aguila-Montes goes against you, they don't get a second bite at the apple because there's nothing that they would be able to show under the modified categorical. Right. I think that's been the jurisprudence of this Court, that unless there's an argument that there – that there is something else that could be shown by the reviewable record of conviction that you won't remand. And I would argue that the jurisdictional issue is a red herring because the Board clearly stated that in the final order that the – that the issue is ripe for final – for review and that they hadn't changed or discussed in the second order anything about the crimes of moral turpitude, that this case, there's no interlocutory appeal, there was no remand by the final order to the Board of Immigration Appeals. There's basically – the Board itself said that there was a final order. Basically, it would be like a metaphysical exercise of arguing about how many angels dance on the head of a pin to say – So are you saying the August 2005 decision that he – that Saavedra was removable under INA 237A2A, two little I's, was the final order and that we're – is that – is that the final order? Well, the final order is on page 1 of the Court administrative record. But it's the August 2005 – No. No. The June 1, 2007, is the final order that – well, actually, the June 1, 2007 opinion does state that the – that the August 30, 2005 decision is the final order. Okay. Yes. That's what I thought. Yes. And so the only way that that order can be removed – could be reviewed would be by this Court. And you're saying that's the final order. Exactly. That's where our jurisdiction lies. Exactly. Now, with regard to the merits, I can rattle off a number of reasons why this is categorically not a crime of moral turpitude. Number one, there was no – there's no intent to harm in the statute. Number two, no harm is required. Number three, the California courts say that misdemeanor false imprisonment is not a crime of moral turpitude. But we don't have a Ninth Circuit case, though, right? No. There's no Ninth Circuit case. So this is a question of first impression for us on whether the 236 is a categorical That's correct. There was some suggestion in the government's submission that this wasn't really false imprisonment. This was something about intimidating witness. Right. That's true. The government indicated in their brief that actually the conviction records show that one of them was actually nonviolent dissuasion of a witness. But that's – I believe that that's not really before the Court, because the NTA lodged by the government said there were two crimes of false imprisonment. The Respondent pleaded to the NTA and conceded – admitted the allegations. It wasn't an admission in testimony, but in the pleading stage, basically admitted the allegations, but denied the charge that it was crimes of moral turpitude. Now, usually the government will argue, as we saw before, that once there's a notice to appear and a concession is to the allegations in the notice to appear, then that's final. The government didn't exhaust in the case below this issue. In other words – They tend to want to add a charge. They want to go back and add a charge, right? Right. Or substitute a charge. They want to substitute a charge. But it's a different charge. It's not the misdemeanor 236, right? Don't they want to add a 136.1b1 conviction? That's correct. Before the Court? That's correct. But, you know, we could still end up in the same situation, because if they – if it was remanded and the board said, well, you have one crime of moral turpitude, we've already decided, namely the false imprisonment, and then we have another crime of moral turpitude, the nonviolent dissuasion of a witness, then we still have two crimes of moral turpitude, so we'd be in the same situation. They – and, you know, this wasn't exhausted below the government is saying, we will help the Petitioner by remanding, but with friends like that, we don't need enemies. What – you know, we're not asking for any assistance. We think that the issue has not been exhausted below. There's no jurisdiction for this Court to really look behind the pleadings. In other words, the pleadings in immigration court are like the complaint and the plea of guilty in a criminal court, and it could have been a tactical decision on the Petitioner's part to admit that there are two crimes of false imprisonment, or it could have been out of ignorance. But either way – If we grant the Petitioner and he wins here, then can he come back? Well, yes, because under the recent Supreme Court case dealing with stays, I don't know how to pronounce the name of that case. It begins with an N, and it has a K and an H and an E and an N in it, I believe, that that case the government conceded that under – that an alien could come back if there was a final order of removal, and then it was – as long as he stayed in the country until there was a final order of removal. So what exactly are you asking us? So we're – I'm asking you to go to the issue on the merits and decide the case of first impression, which is whether false imprisonment and misdemeanor is a crime of moral turpitude. Well, categorically. Categorically, right. Which wouldn't necessarily – so if we said it was not a categorical crime, that's still – but you're also asking us, if I understand correctly, to not remand on the modified categorical approach, because you're saying they already got a bite at the apple, they had all those documents there, and they don't get to – they don't get a second chance. Right. I'd reserve my time for a rebuttal. May it please the Court, excuse me, Brian Beyer on behalf of Eric Holder, the Attorney General's Respondent. I apologize in advance for my voice. Hopefully, it will stay strong enough. It's true that there are two issues in this case, but the first issue, the jurisdictional issue, is dispositive. The Court should hold that it lacks jurisdiction and remand the case for the Board's further consideration. But if we lack jurisdiction, how can we remand the case? Well, Your Honor, there's a couple of theories. One is that – and this point wasn't briefed, but just as a matter of – of practice in administrative law, often when the Court – when the Government requests a remand to an administrative agency, courts should generally grant those requests, provided they're in good faith, to permit the agency to further consider its position and things like that. But that's not what you're doing here. You want to get it back, and you want to get that new charge in, and you just want to go for it. Well, Your Honor, it's correct that the – the charges do need to be corrected because of the – the discrepancy between the conviction records and the allegations and admissions and basis of the agency's position. Why couldn't you do it right in the first place? Your Honor, I don't have an answer for that. The sequence of events was as follows. The charge was brought in the NTA through his counsel, Mr. Cerveja-Figueroa, admitted the crimes – or he admitted the fact of the conviction. Then the Government propounded the documents with the conviction record in it, or the evidence of the – the 136.1 conviction. And then the Court – the immigration judge received a briefing on the issue, including a brief from Mr. Cerveja – Mr. Cerveja's counsel, which observed simply that the document relating to that conviction did not establish a domestic relationship without making any further observations about the nature of that conviction record. Well, the second bite at the apple is a little bit like the immigration version of double jeopardy. It's sort of if you don't do it – you know, it's one thing if the opportunity didn't present itself that, you know, we remand things off. But when you have that opportunity and you don't do it, you know, it's kind of like how many times can you go back to get it right? Because everything was available at that time. And I'm not sure that in terms of assuming – assuming that this is not a categorical crime, and then – and then let's assume that Navarro-Lopez gets overruled. I'm making a number of assumptions, which I have no authority to do other than that I'm assuming. And then if it went back, what would you – what would you be able to show in terms of that the 236 under a modified categorical approach meets the criteria that wasn't there in the first place? I – I don't know what all the documents are that – that Immigration Customs Enforcement might introduce. I know that there is a – a complaint. I think that was in the record. The immigration judge did not address and the board did not address the modified categorical approach. There's – there's a bigger issue, though, with respect to the question whether the crime is a crime involving moral turpitude. And it's that it may very well be that the crime is categorically a crime involving moral turpitude. The problem with the agency's decision, assuming that the – the IJ decision and the first BIA decision actually represents the agency's view on the matter, even though it's been vacated, is that it does not – it does not state what standard was being applied by the agency and it does not actually apply that standard so that it's – it's really possible to determine what the different factors are as to why this crime was viewed as a crime involving moral turpitude. I have not responded in my brief to the arguments regarding force and violence and fraud and things like that. But those aren't necessarily only hallmarks of moral turpitude. And the agency should have an opportunity to apply a discernible standard, which it has not done, before the Court reviews the – before the Court reviews the substance of that determination. Well, you just decided what you were going to win on and then you don't even address his arguments. So – Well, no, Your Honor, that's – that's not – not quite fair. We don't address the issue – Didn't you – did you address whether 236 was a CMIT? No, we did not. And we did not do that – in this brief, we did not do that in the prior brief. Our position in the prior brief was that the aggravated felony conviction, which had not yet been vacated, was dispositive of the entire case. The question of whether he was convicted of false imprisonment or – or something else wasn't dispositive of anything at the time. In fact, Mr. Cerveja-Figueroa's position before the agency was – before the immigration judge was essentially conceding that it was an aggravated felony that he'd been convicted of. And he argued that notwithstanding that, he remained eligible for relief from removal. It's only after that conviction was vacated that these other issues became more important. I mean, I don't not mean to say that – that it was appropriate to shortcut the process or anything like that, you know, given the fact that the aggravated felony conviction, but that's sort of the reality of the case. Excuse me. The reason why – well, there's about three – there's two good reasons why we did not address the question of whether the – the false imprisonment crime was a crime involving moral turpitude. First, as I mentioned, we don't really have an agency decision that clearly explains their reasons for doing it. And it's inconsistent with administrative law principles for me to try to advance a rationale that the Court could adopt to agree with the agency if the agency hasn't stated it. Second, and more importantly, it's just inappropriate for the government here to urge that this removal order can be sustained when there just isn't the factual basis for it. I mean, the difference between this case and other cases where the immigration judge and the agency have relied on admissions of facts is that those admissions are consistent with – or at least not contradicted by other evidence of record. It seems to me that if you – you sat here this morning, and it would – it seems to me that if you could – if anyone could take anything away from this, that the Court is asking questions which could give some indication that the Court isn't viewing things exactly the same as the government, and so the government's taking its position in briefing, well, this is the way we see it, and so we're therefore not going to address other arguments because they just – you know, it's like if – you know, it's sort of like if I, la, la, la, la, la, you know, I cannot hear you, then I won't. And – but then, you know, repeatedly we're saying, well, what if we decide to address it, then we don't have – you know, the government has taken a position that they're not responding. That doesn't seem to be a wise way to approach things, and I'm – we've seen it in a number of cases this morning. Sure. Well, Your Honor, if there had been, you know, a colorable basis for thinking that the Court had jurisdiction and not these other problems, where the case would need to be remanded, my brief certainly would – and if I had an agency rationale to defend, I certainly would have defended that. You asked for a remand. All along, yes. So – so you obviously thought there was a basis for a remand. Yes. But you wanted just on your terms. And what Judge Carahan, I think, is asking is saying, since you say it's going to go back, why weren't you required to explain your position or defend against the argument that if it does go back, it should go back without giving the agency a chance to reconsider those two – those two convictions? Well, I think the Petitioner doesn't object to a remand so long as we say the agency is I think you'd be happy to go back on that basis. Well, perhaps so. I mean – And you haven't really given any explanation of why this other charge, it was known, it existed, why it wasn't alleged at the time. There hasn't been any attempt to, you know, explain that. And so it's when you want this, you have to – you kind of have to make – it's just like on a – when a lot of – we deny a lot of petitions to reopen because people don't give us any indication that they would win. And they say, well, we just want – we just want to go back and talk about it. And we say, no, no, no, no, no, you have to give some indication. And you know, I guess I can't even tell you – my staff knows – I can't even tell you how much I hate the categorical and the modified categorical approach. I can't even tell you that I don't think they could have made it any more complicated. It would be much easier if we said if people got convicted of crimes, period, that then they had to go back. But we don't do that. And so I have accepted, albeit reluctantly, that I have to follow the law. And it's – despite it being very confusing, it just seems like that the government should sort of similarly realize that we have all this precedent, we have all these confusing decisions that probably don't make any sense, but they're there, and we've got to follow them. Yes, Your Honor. The – as you just stated, you know, the court's obligation is to follow the law. Similarly, the agency's obligation is as well. And the purpose of the remand broadly stated is to make sure the case is decided right. I mean, there's no doubt that there were errors made. But if you didn't give it a go the first time, you don't – you don't get a – it's – there's case law out there that says you don't get a second bite of the apple. So you have to somehow explain how it's not a second bite of the apple. And I'm not hearing any explanation as to why this couldn't have been alleged in this other charge, couldn't have been alleged in the first notice to appear, any of those things. It's just now – what you're saying is we want to go back now and we want to do it right, and we just want to start this all over. And the case law doesn't let us do that. Yeah, a lot of petitioners say that, too. They say, yeah, now that we know that that didn't work, we want to take another approach and – You don't want us to open that door, do you? I mean, if you stand in that doorway and open that door, you're going to be hampered. Well, the Court has a point there, sure. Why don't you just go back there and solve this case with opposing counsel? Really. You guys can solve it. I've – as my friend has said, and we'll have coffee afterward, as you suggested, you know, we're always willing to talk. It's been the government's consistent position this case should be remanded to let the agency get it right. And, you know, if we can work out something, we certainly will advise the Court of that. Will you settle for partially right? Pardon me? Will you settle for partially right? Almost right? We'll get it as close to right as we can. Good enough for government to work? But I'd like to use a couple of my minutes of remaining time to address the jurisdictional issue, which I haven't had a chance to do. Under Lopez-Ruiz and Timbreza and Cordes, there's really a bright-line rule for jurisdiction here. It's that if the agency reopens a case, the removal order is no longer administratively final. And the Court at that point lacks jurisdiction. Now, the statute that authorizes judicial review of aliens' challenges to removal orders is predicated on there being a final removal order throughout the petition for review process. Now, the implications of – in fact, Lopez-Ruiz addressed a situation very much like this expressly. It said that in that case, the alien had the conviction vacated. That was the basis for an aggravated felony finding. The case was reopened. The Court dismissed. The Court said it would not hold the case in abeyance and would not reactivate the prior petition for review because the remedy was to provide a – or to get a new petition for review filed if there was a final order of removal reinstated. And at that point, the petitioner could bring whatever challenges had been presented to the board prior to the removal order. So what – so in this case – I'm sorry. Go ahead. Kennedy. But see, we have enough jurisdiction to remand, right? I'm sorry? We have enough jurisdiction to remand. Yes. So if we have enough jurisdiction to remand, why can't there be enough jurisdiction to set the terms of the remand? I mean, once you get there, you know, once you say we have jurisdiction to do that, we're not bickering about what terms we will – what our remand order will say. Your Honor, the question that you choose not to – It's like being a little bit pregnant. Well, that's – that's true, but our request was to remand without any terms. I mean, if you start to set – I understand that's your preference, you know. If I got everything I wanted, you know, I – There's actually a little more substance to it than that. When the Court starts to set terms, set limits, it's resolved certain issues on the merits. And it doesn't have jurisdiction to do that. It doesn't have jurisdiction to review the merits of the removal order. Right. But we do have jurisdiction to say the case goes back. And we could just as well say the case goes back and the two convictions for false imprisonment are conclusive. You can't look behind them. You could do that, right? Well, Your Honor, it would be appropriate to permit the Board to – and ICE to supplement the record. I don't know – I understand. The question is not – you know, and you can try to persuade us as to what we should say, but you can't, you know, blow and suck at the same time. You can't say we have no jurisdiction, but we have jurisdiction to say just exactly what the government wants us to say. That's a little much. I mean, this is – Well, I mean, it's a very odd posture to talk about what – That's why I think you guys ought to solve it. I'm sorry? That's why I think you counsel can solve this whole thing. I would like to do that, Your Honor. It would be much, much more straightforward. I want to make – Have you been in mediation? Pardon me? Have you been in mediation? We have been through, what, two sessions of mediation? Yes, two sessions of mediation. Our mediation office here? Pardon me? Our mediation office here? Correct. Correct. But was your position exactly what you're saying right now? Without getting into confidentiality issues – Right. We have tried to work with Petitioner to, you know, make sure that the remedy that we would formulate through the mediation would, you know, be the equivalent of whatever this Court could give. We tried to keep it away from the panel. I mean, among other things, I mean, do you have to insist that Petitioner come back and be – spend years in prison for this thing to be resolved? That's one of the big issues. I mean, he has to come back here on his own expense just so he can be – he can surrender and be put in prison. I mean, what's the need for that? What is the essential need for the government to have his body here in prison? Some of the issues – well, one important reason that he may – his presence may be required. And I should say that it's perhaps possible to craft a remand order to address some of these issues. I mean, one of the things that needs to happen is that ICE would need to lodge a corrective charge, and Petitioner has a right to plead to that. If the Court's order is written in a way that permits him to plead to that from abroad, that would possibly be one way to do it. We'd have to work with the Executive Office for Immigration – Can he go to the U.S. consulate? I'm sorry? Can he go to the U.S. consulate and – That's a possibility as well. He might be able to appear, you know, through video conference or something like that. Video conference? I like that. I don't know what the capabilities are. He can do it on YouTube. Yeah. That would be a step beyond where they'd consider. Or maybe he could come here and you wouldn't have to arrest him, right? Does he have to be arrested? I mean, there are a gazillion people in various forms of deportation proceedings that are not in custody in this country. Why would he have to be in custody? Your Honor, the question of the custodial status is an issue for Immigration and Customs Enforcement. I don't have an answer as to whether it would be necessary to detain him. I know particularly since ICE has been revisiting some of its detention policies, you know, whatever the answer might have been at one time in the past, it may not be the answer anymore. I don't – I'm sorry, I'm not prepared to answer that question. Well, I was not saying you should answer the question. I'm just saying I was suggesting fruitful areas of exploration if you were to mediate the case. It's much harder for us to cut them over to saying, you know, plead by video – by tele-video conference or say come back and, you know, don't take him in custody or anything like that. But there's always things that the government can conceive, right? Oh, Your Honor. It can – these are questions to me. I mean, they could be mediated, right? Yes, Your Honor. And let me say the government is very sensitive and aware of Mr. Cerveja's concerns on that score. We've – in fact, the government has attempted – and some of the things that could be done, it could be, you know, making sure that the hearing is scheduled in an expeditious manner, making sure that whatever additional administrative proceedings are conducted quickly. You know, it's a matter of scheduling. Just to point out, the record reflects that part of the reason this case went forward so quickly in the agency is because of Mr. Cerveja's request for expedition in view of the health of his father. I mean, the case went from NTA to final BIA decision from, I think, March to August of 2005. And at every step of the process, there was a request by Mr. Cerveja to expedite the hearing and the determination of the appeal because he wanted to make sure that it was concluded. It sounds like he has a pretty good lawyer. Pardon me? Sounds like he has a pretty good lawyer. Well, and he has a responsive agency. I mean, when there's a showing of cause like that – Credit what credit is due. I'm sorry? I said we'll give credit what credit is due. I – One additional point. I mean, given that our jurisdiction to do anything is so iffy in this case, wouldn't it be the wiser thing for us to suspend the case for a bit longer and let you guys try to work out these issues a bit more now in light of what you've heard our concerns to be? The government, you know, we've consistently attempted to resolve this, and we're certainly willing to try. There's something magic about this. I'm sorry? There's something magic about this building. Great mediations have taken place. With the consent of my colleagues, maybe we'll defer submission of this case for a bit and hope you can work it out. I mean, you both look like terribly reasonable – I mean, quite reasonable and responsive responsible lawyers, and it's not always true in every case. Many cases the lawyers fight with each other and forget about what the case is about. But it seems to me in this case, everybody's got in mind what the case is about. And given that our jurisdiction is so iffy, it seems to me the best possible thing to – I mean, it's to no fault of anybody. It's just – I'm sorry? To no fault of anybody, but our jurisdiction is so tenuous. Yes. Maybe the best thing to do would be to try to give you all another chance to work it out, to work something out that would be better than what we could do. It seems like a broad signal to sit down. I think so. Thank you, Your Honor. Mr. Mayor? I only want to address the last issues that you raised. And my associate told me we should give them an opportunity in mediation. That we could maybe get some reasonable rules set forth in mediation so that my client wouldn't have to come back and be arrested. I said it's never going to work for – he has to be present for there to be jurisdiction. There's mandatory detention for two – for allegations of two crimes of moral turpitude. Against my better judgment, I agree with my associate and let it go into mediation. The – my friend is very reasonable, but he considers himself the attorney for the agency, which is correct. So before he can make any – he can't make any decisions on his own, apparently. He has to request the agency's district counsel, the attorneys in San Francisco. I think we understand all that. District counsel refused to compromise on anything. They said, no, there has to be mandatory detention. No, he has to come back. And it's not going to change because the rules, unfortunately, are ironclad. And I practice in immigration court. I don't just write briefs. And every day people are being held in detention for two crimes of moral turpitude. And it's – and it's worse than that because what is the definition of a crime of moral turpitude? And under Silva-Trevino, which the – which the immigration courts have to apply, you can supposedly go behind the record of conviction. And so almost anything could be a crime of moral turpitude. So what that has caused is increased detention, that – that there's been a lot more cases which would have been thrown out on a categorical, modified categorical basis, but instead any – any crime is subject to additional evidence to get to the facts. Therefore, there's increased detention. And – and I can – you know, I'm happy to – to go along, obviously, with whatever the court orders. The court wants to suspend for us to try mediation. Fine. I have no problem with that. I just don't think it's going to work. And just one last thought. No matter how reasonable I am, I don't see that the government is willing to bend. And the government will say we can't bend because in INA Section 236C, it says if there's two crimes of moral turpitude, it's mandatory detention. Now, you know, this Court obviously can issue decisions about what is a crime of moral turpitude without remanding to the agency. And under Skidmore, where there's an unpublished decision where there hasn't been development by the agency of a – of a valid or consistent rationale or a very recent decision, then the unpublished decision is not persuasive. Our whole system of Article III judges, of course, is to sometimes render decisions where an agency hasn't issued a valid persuasive decision under Skidmore or a binding decision under Marmolejo-Campos where it's a published decision. So because they already had a bite at the apple and did not render a persuasive decision, I submit that this Court should issue a decision. They had a chance. My time is up. Okay. Thank you. Well, we will confer. We will confer and decide whether or not we'll submit or what we will do. But you are in the courthouse, and we have coffee, a very nice coffee shop downstairs, very close to the mediation office. We will take a short break before the remainder of the calendar. Thank you.
judges: Kozinski, Archer Callahan